ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 0 3 2020 ★

BROOKLYN OFFICE

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK



Ahmed Elnenaey

    *Plaintiff*

v.

JPMorgan Chase Bank, N.A.,
Yoram Nachimovsky, PLLC,
2939 Avenue Y Tenants Corporation,
Rosicki, Rosicki & Associates, P.C.,
Paramount Land, Inc.,

    *Corporate Defendants*

and

James L. Dimon a.k.a Jamie Dimon,
Yoram Nachimovsky, Esq.,
Cynthia G. Rosicki, Esq.,
Thomas Peter Rosicki, Esq.,

    *Principal Defendants.*

20-CV-5430

DONNELLY, J.
BLOOM, M.J.

Case No. _____

**VERIFIED COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

# TABLE OF CONTENTS

I.   NATURE OF THIS ACTION ................................................................................................ 2

II.  JURISDICTION, VENUE, AND STATUTE OF LIMITATIONS ...................................... 5

III. The Evidence ..................................................................................................................... 6

IV.  The Subject Property and The Security .......................................................................... 6

V.   The Parties ........................................................................................................................ 7

     Plaintiff ............................................................................................................................. 7

     Corporate Defendants ..................................................................................................... 7

     Principal Defendants ...................................................................................................... 8

     Non-Party Agents/Employees of CHASE ..................................................................... 10

VI.  THE AGREEMENT ......................................................................................................... 13

     Collateral Was Pledged As Security for HELOC Loan No. 0789108248 Only .................. 13

     Overview of the WaMu Equity Plus Agreement and Disclosure ......................................... 13

     Suspending Advances and Reducing Credit Limits is Absolutely Prohibited ................... 15

     Since At Least January 2009, Chase Demanded Principal Payments Yet Refused
     To Restore the Available Credit Limit By An Equal Amount ........................................... 17

     Chase's Failure to Perform Under Fixed Rate Loan Terms is Usury and the Only
     Prevent Chase's Material Breach is to Terminate the Credit Line .................................... 18

VII. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ....................................... 19

     Plaintiff Was a *Bona Fide* Purchaser for Value and Acquired the Subject Unit as
     a Bank Owned Property From a Good Faith Seller in Possession ..................................... 20

     Plaintiff Renovated the Entire Unit and Added a Second Bedroom .................................. 21

     Plaintiff Started A Home Improvement Contractor Business ........................................... 22

     On September 25, 2008, Chase Acquired WaMu in a Voluntary Sale From the
     FDIC Pursuant to 12 U.S.C. § 1821(d)(2)(G)(i)(II), Not By Operation of Law .................. 22

     Chase Refused To Perform Under the Terms of the Agreement ....................................... 24

     Chase Released Its Security Interest in July 2009 ........................................................... 24

     The Defendants All Knew the Unit Was Occupied By Its Owner Yet Still
     Proceeded with Their Illegal Purchase and Sale ............................................................. 25

     Conscious Avoidance is the Legal Equivalent of Knowledge ........................................... 30

     Clear Evidence of Planning, Coordination, and Concealment ......................................... 31

VIII. CAUSES OF ACTION ...................................................................................35

VIOLATIONS OF THE RICO STATUTE, 18 U.S.C. §§ 1961-1968 ......................35

      The Enterprise.........................................................................................35

      The Pattern of Racketeering Activity ...................................................36

      First Predicate Act: Collection of an Unlawful Debt...........................36

      Second Predicate Act: Extortion, Attempted Extortion, and Conspiracy to Extort (Hobbs Act) and Collection of Extensions of Credit By Extortionate Means (18 U.S.C. § 943): ..................................................................................38

      Third Predicate Act: Laundering of Monetary Instruments (18 U.S.C. § 1956) ...............39

      Fourth Predicate Act: Dealing in Property Derived From SUA (18 U.S.C. §1957) ..........40

      Fifth and Sixth Predicate Acts: Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)..............41

      Economic Injury to Plaintiff ................................................................44

      Plaintiff is Entitled to an Award of Treble Damages..........................45

CONSPIRACY TO VIOLATE THE RICO STATUTE 18 U.S.C. § 1962(d) ...........47

DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201, 2202...........49

PERMANENT INJUNCTION ................................................................................51

COUNT FIVE to COUNT FIFTEEN.......................................................................52

DISCLAIMER .......................................................................................................52

VERIFICATION.....................................................................................................54

Plaintiff AHMED ELNENAEY ("Plaintiff"), appearing *pro se*, prays for a liberal reading of this Complaint and alleges upon personal knowledge acquired during a non-jury trial of a Holdover proceeding in the Civil Court of the City of New York, Kings County Index No. 084765/2016, entitled, *Yoram Nachimovsky v. Ahmed Elnenaey, John Doe, and Jane Doe* ("Holdover"). The Post-Trial Decision/Order dated January 15, 2019 (J. Eleanora Ofshtein), the September 2, 2016 Holdover Petition ("HP") by Defendant Yoram Nachimovsky, Esq., along with his Affidavit, sworn to on April 9, 2017, are incorporated herein and made a part hereof to identify the undisputed facts and legal conclusions that bind the parties and establish the Plaintiff's entitlement to relief as a matter of law.

Plaintiff's allegations are also founded upon personal knowledge acquired in the Supreme Court of New York, Kings County, Index No. 6698/2016, entitled *Ahmed Elnenaey v. Yoram Nachimovsky, Esq., 2939 Avenue Y Tenants Corporation, Does I-X, and Roe Companies I-X*. The Supreme Court granted Plaintiff leave to withdraw a joinder motion and nine out of ten causes of action *without prejudice* and with leave to renew in a separate action against all necessary parties. This is the separate action against all necessary parties.

Lastly, upon information and belief based on relevant court and business records in evidentiary form produced by the Defendants in response to discovery demands in both city and state court cases involving identical parties which are attached hereto and made a part hereof, Plaintiff therefore alleges the following:

1

## I.    NATURE OF THIS ACTION

1.    This is a story about greed taking over America's largest bank, turning it into the most profitable loan shark and most powerful corrupt enterprise in history.

2.    For years, government agencies like the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC) and the state attorneys general failed to tame the bank's insatiable appetite for illicit profiteering through extortionate, usurious, and morally unconscionable extensions of credit, illegal and fraudulent foreclosures, contemptuous and perjurious litigation strategies, and other underhanded methods in connection with the servicing of federal home loans.

3.    Apparently, multi-billion dollar settlements are inadequate to cure a deep-rooted culture of vulture capital where megalomaniacs turn conference rooms into War Rooms and launch missions like "Operation West," a plan to put Washington Mutual Bank ("WaMu") into receivership in order to acquire its assets in a fire sale.

4.    Operation West was a success. WaMu's assets were raided and its army of creditors were annihilated. Plaintiff was a WaMu customer forced into financial servitude after the bank violated the terms of his credit line secured by his Cooperative ("Co-op") stock and lease. Said breach ultimately led to Plaintiff's default.

5.    The U.S. Supreme Court has said an important purpose of the RICO[1] civil provision is to encourage private citizens to help combat "a serious national problem for which public prosecutorial resources are deemed inadequate." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987). Enter civil RICO.

---

[1]    Formally, Title IX of the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations Statute (18 U.S.C. § 1961, *et seq.*), hereafter, "RICO."

6.    To be clear, Plaintiff is not another state court loser complaining of garden variety fraud in the procurement of a state foreclosure judgment. *That is not what this case is about*. In fact, this case is exactly the opposite. The bank breached its obligation to restore Plaintiff's Credit Limit balance years before he defaulted, causing the terms of the agreement to become usurious and morally unconscionable. Here, there can never be any foreclosure judgment because the underlying debt is usurious and unlawful. There can never be any judicial confirmation of a Uniform Commercial Code (UCC) Article 9 nonjudicial sale for the same reason.

7.    Instead, the bank had to resort to extortionate threats and fraudulent schemes to collect an unlawful debt from the Plaintiff.

8.    Specifically, the bank created a fake loan number and proceeded with a fake UCC Article 9 sale. Then, the bank conspired with the *Co-op Attorney/Stock Transfer Agent* (one person) to pass a counterfeit Co-op Stock Certificate under the guise of a bank-owned sale of the fake certificate to the Transfer Agent himself for $50,000.

9.    Defendants will argue that their shady transaction was a lawful real estate transfer at arm's length for valuable consideration and which was duly recorded in the public records with all required taxes and transfer fees paid.

10.    But just because an illegal transaction appears lawful, does not make it so. It just proves effective concealment and demonstrates a degree of planning and care.

11.    To illustrate, consider an almost identical situation:

> J.P. sells counterfeit $100 bills for $40 each. Yoram buys ten and takes them to work. Ahmed sells lemonade for $1. After 1,000 sales, Ahmed goes to the bank to exchange the small bills for ten $100 bills. Yoram is the bank teller. Yoram takes Ahmed's $1,000 and hands him an envelope with ten counterfeit $100 bills from J.P. and keeps the ten real $100 bills for himself. Thus, the proceeds split 40/60.

(a)    In sum, a Stock Transfer Agent that pays $50,000 for a counterfeit Stock Certificate then swaps it out for a real one in his capacity as the Stock Transfer Agent is no different than a bank teller paying $400 for ten counterfeit $100 bills and swapping them out for real ones in his capacity as a bank teller/Cash Transfer Agent.

(b)    The point is both transactions are illegal because the transactions involve proceeds from *Specified Unlawful Activity* ("SUA"). See 18 U.S.C. § 1957.

(c)    In the example, J.P. and Yoram use counterfeit U.S. notes which is a violation of 18 U.S.C. §§ 471, 473. Here, Defendants use a counterfeit Stock Certificate of a Co-op in violation of 18 U.S.C. § 513 and 18 U.S.C. § 1005.

12.    Moreover, the Defendants have all attempted to collect an unenforceable extension of credit by extortionate means in violation of 18 U.S.C. §§ 894 and 1951.

13.    Then, there is also the more common predicates of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

14.    All of this extra-judicial and extracurricular activities by the corrupt Enterprise of banksters and lawyers is the result of the usurious, morally unconscionable, and legally unenforceable credit terms applied by the servicer bank.

15.    **Plaintiff now seeks to be relieved from the bonds of financial servitude and to recover threefold the losses to his business and property over the past decade as a direct and proximate result of the Defendants' RICO violations in connection with the collection of an unlawful debt by extortionate means.**

## II.    JURISDICTION, VENUE, AND STATUTE OF LIMITATIONS

16.    This Court has original federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961, *et seq.* and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) which form part of the same case or controversy under Article 3 of the U.S. Constitution.

17.    This Court has jurisdiction to enter declaratory judgment 28 USC §§2201,2202.

18.    The claims herein were caused by a successor bank *after* it acquired a failed bank so exhaustion of the FIRREA's administrative claims process is not required.

19.    Nor are Plaintiff's claims barred by the RICO Amendment. This case involves private securities and fraud *not* securities fraud of publicly traded stock.

20.    This Court has personal jurisdiction over the Defendants pursuant to New York CPLR §§ 301, 302 because the Defendants are all citizens of New York ("NY") or are registered to do business in NY, including the Easter District of NY ("EDNY").

21.    Venue lies in this District pursuant to 28 U.S.C. § 1391 because the property that is the subject of this action is situated in Brooklyn, NY and the majority of Defendants either live in or maintain a principle place of business in the EDNY.

22.    The causes of action detailed within this Complaint fall within the pertinent statute of limitation requirements. Defendants also concealed their scheme at every turn, defying valid judicial subpoenas to avoid exposure. Moreover, the running of the statute of limitations is equitably tolled by the abusive and fraudulent litigation tactics in the prior related cases. Finally, jurisdictional challenges to the expiry of a statute of limitations was previously considered and rejected by the Supreme Court.

## III.  THE EVIDENCE

23.  An Appendix of documentary evidence mostly produced by the Defendants is attached hereto and made a part hereof to help form the basis for this Complaint by demonstrating that a cause of action exists, regardless of the pleading sufficiency.

    (a)  A list of documents in the Appendix is at the end of this Complaint.

## IV.  THE SUBJECT PROPERTY AND THE SECURITY

24.  The Subject Co-op Unit "3J" (the "Unit") is located in the Defendant Co-op, 2939 AVENUE Y TENANTS CORPORATION ("Y-CORP") located at 2939 Avenue Y in Brooklyn, New York. Title to Unit 3J is represented by 582 shares of Y-CORP stock ("Stock") and a proprietary lease to Unit 3J ("Lease"). Hereafter, "Stock" and "Lease" are together referred to as the "Title," "Security," or "Collateral".

25.  Plaintiff acquired Title and took immediate possession of the Unit,

    (a)  *as a bank-owned foreclosure from Investor's One Corp. ("IOC"),*

    (b)  *for $117,000 in cash without financing,*

    (c)  *after inspecting the Unit three times* to confirm it was vacant, unoccupied,

    (d)  *and from a seller in physical possession with keys and unfettered access.*

26.  On December 1, 2005, Plaintiff closed on the Title to Unit 3J at the law firm, Defendant YORAM NACHIMOVSKY, PLLC ("PLLC") and took immediate possession of same. Defendant YORAM NACHIMOVSKY, ESQ. ("YORAM") was present at the closing and represented Y-CORP as their *Co-op Attorney/Stock Transfer Agent.* YORAM registered the Plaintiff as the owner of Unit 3J and issued Stock Certificate No. 134 to the Plaintiff.

6

## V.    THE PARTIES

<u>PLAINTIFF</u>

27.    Plaintiff AHMED ELNENAEY ("Plaintiff") is a natural person residing in the subject Unit located at <u>2939 Avenue Y, Apt. 3J, Brooklyn, NY, 11235</u>. Previously,

(a)    Plaintiff attended Penn State University on an academic scholarship, graduated with a Bachelor of Science degree in *Biochemistry and Molecular Biology,* and started a career in pharmaceutical sales in NY. Before turning 25, Plaintiff was promoted to Oncology Specialty Sales, earning a six-figure salary, and was one of the youngest professionals at *NYU Stern School of Business Part-Time MBA Program.* His employer paid for his tuition. In short, <u>Plaintiff was both smart and successful.</u>

(b)    Plaintiff also happens to be financially astute, present hardship notwithstanding. In 2002, Plaintiff purchased his first apartment as a bank-owned Co-op for $63,000 which he sold in 2005 for $215,000 and used the proceeds to buy the subject Unit ***in cash without financing***. Thus, Plaintiff was financially shrewd and did not take on debt he could not afford. On the contrary, Plaintiff acquired Title free and clear in 2005 and was a true bona fide purchaser of value acting in good faith, unlike the Defendants.

<u>CORPORATE DEFENDANTS</u>

28.    Defendant JPMORGAN CHASE BANK, N.A. ("CHASE") is a national bank with its principle office in Columbus, Ohio. CHASE affects interstate commerce with its vast network of bank branches located in the EDNY and across the United States.

29.    Defendant YORAM NACHIMOVSKY, PLLC. ("PLLC") is a NY law firm sole

proprietorship located at <u>299 Broadway, Suite 605, New York, NY, 10007</u>. PLLC represents Y-CORP as their attorney and is the counsel of record in Supreme Court.

30.  Defendant 2939 AVENUE Y TENANTS CORPORATION ("Y-CORP") is a NY Co-op apartment corporation located at 2939 Avenue Y in Brooklyn, NY. Y-CORP is a Defendant in the Supreme Court action and is represented by PLLC.

31.  Defendant ROSICKI, ROSICKI & ASSOCIATES ("RRA") is a NY law firm with its main office in the EDNY at <u>51 East Bethpage Rd., Plainview, NY, 11803</u>. At all times relevant, RRA has been a law firm specializing in mortgage foreclosures, and at all times relevant to this action, RRA has represented CHASE as their attorney and extortionist debt collector. RRA has been integral to the Enterprise corruption.

32.  Defendant PARAMOUNT LAND, INC. ("PLI") is a NY title search corporation with its main office located in the EDNY at <u>584 Main St., Islip, NY 11751</u>. PLI and RRA have the same owners, share office space, and administrative, accounting, payroll services. PLI violated <u>NY Pen. L. § 175.30</u> by offering the following false instruments for filing in the Office of City Register in Kings County:

- **CFRN 2012000364669**, filed on September 14, 2012 and
- **CFRN 201800007062**, filed on February 28, 2018.

33.  In 2018, RRA and PLI agreed to pay $4,600,000 ("$4.6M") in *U.S. ex rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, P.C., et al*, for ripping off the Federal National Mortgage Association. *See* **SDNY Case 1:12-cv-07199-JSR; Doc. 233**.

<u>PRINCIPAL DEFENDANTS</u>

34.  Defendant JAMES L. DIMON, also known as JAMIE DIMON ("DIMON") is a natural person who, upon information and belief, resides in New York, NY. DIMON

has been the President, Chief Executive Officer ("CEO"), and Chair of the Board of Directors ("Board") of CHASE's parent company, JPMorgan Chase & Co. ("JPMC") since 2007. CHASE is a wholly owned subsidiary of JPMC.

(a)    During a 2011 review of CHASE's residential real estate mortgage foreclosure process, the OCC, "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." As relevant here, the OCC found that CHASE:

> initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time," and "failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."

(b)    DIMON and the rest of the Board at JPMC signed the Consent Order, essentially promising that CHASE would clean up its act by:

> taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes.

(c)    DIMON and CHASE were on notice of the illegal and fraudulent conduct.

(d)    The Consent Order dated April 13, 2011 (OCC #2011-15) as amended by Consent Order (OCC #2013-129) is incorporated by reference.

35.    Defendant YORAM NACHIMOVSKY, ESQ. ("YORAM") is a natural person residing at 1684 E. 21st St., Brooklyn, NY, 11210. In 1988, YORAM was admitted to practice law in NY, reg. no. 2185213. YORAM is the sole proprietor of PLLC and has been the *Co-op Attorney* and *Co-op Stock Transfer Agent* for Y-CORP since 2005.

(a)    On July 25, 2016, YORAM wired $45,163.30 to RRA's escrow account of which $45,000.00 were proceeds from SUA and was subsequently sent to CHASE.

    **(b)**    On the same date, YORAM cancelled Plaintiff's Stock Certificate No. 134 and re-issued the 582 shares of Y-CORP stock to himself under Certificate No. 151.

**36.**    Defendant CYNTHIA G. ROSICKI, ESQ. ("C. ROSICKI") and Defendant THOMAS PETER ROSICKI, ESQ. ("T. ROSICKI" and collectively with C. ROSICKI, the "ROSICKIS") are natural persons residing in the EDNY.

    **(a)**    C. ROSICKI was admitted to practice law in NY in 1987, reg. no. <u>2132900</u>.

    **(b)**    T. ROSICKI was admitted to practice law in NY in 1997, reg no. <u>2824159</u>.

    **(c)**    The ROSICKIS are the principal owners and executives of RRA and PLI.

    **(d)**    They signed the Stipulation to repay the U.S. Government $4.6M in *U.S. ex rel. Peter D. Grubea*, which is incorporated by reference.

<u>NON-PARTY AGENTS/EMPLOYEES OF CHASE</u>

**37.**    In an *Affidavit of Lost Proprietary Lease and Stock Certificate* dated March 16, 2015 ("*Affidavit of Lost Security*"), non-party Jonathan B. Driver ("Driver") states he is a Vice-President at CHASE. and claims that CHASE is the "*<u>servicer</u>*" of the loan and custodian of the collateral securing **Loan Number 429400108248**. He does not claim that Chase is the "secured party." DRIVER describes the loan as:

> 2. "A note (or credit agreement) dated <u>October 18, 2007</u>, in the original principal amount of <u>$168,000.00</u>, with an original interest rate of <u>7.840%</u> per annum, providing for initial monthly payments in the amount of <u>$1,391.93</u>, was executed by <u>Ahmed Elnenaey</u>, and secured by an Assignment of the Proprietary Lease and the shares of Stock made on the same date for the property located at <u>2939 Avenue Y Apt 3J Brooklyn, NY 11235-1632</u>."
>
> 3. Chase's regular business practice is to store PROPRIETARY LEASE AND STOCK CERTIFICATE in collateral files maintained by Chase's agent, JPMorgan Chase Custody Services, Inc., in a secure vault facility in Monroe, Louisiana. After a thorough and diligent search of the hard copy collateral fil pertaining to this loan and the credit file maintained by Chase the PROPRIETARY LEASE AND STOCK CERTIFICATE was not located.

(a)     As mentioned above and explained below, Driver's *Affidavit of Lost Security* is inadequate and false because CHASE was never in possession of the Security and was never a holder in due course or a non-holder with rights of a holder. CHASE is liable violating 18 U.S.C. § 513 under principles of agency and respondeat superior.

38.     Non-party Cynthia A. Riley ("Riley") is a natural person who, upon information and belief, is a citizen of the United States and a resident of Florida.

(a)     Riley is a former Vice-President at Washington Mutual Bank ("WaMu") and was authorized to endorse negotiable instruments on behalf of WaMu. Riley was deposed at 345 East Forsyth St., Jacksonville, Florida 32202 on <u>January 15, 2013</u> from <u>10:00 a.m. until 12:23 p.m.</u> in *JP Morgan Chase Bank, N.A. v. Eduardo Orozco, et al.* in the 11th Judicial Circuit Court of Florida (Miami-Dade County) <u>Case No. 09-29997 CA (11)</u> by defense counsel. At the time of her deposition, Riley was a CHASE employee. Riley testified under penalty of perjury that she was a Vice-President for WaMu from 2004 until November 2006 when WaMu laid off her entire department. Riley also stated that she (and by extension, *her WaMu Endorsement Stamp*) was hired by CHASE in January 2009 to work in *Default Operations*, where her old stamp could be of great value. That same month, CHASE announced plans to lay off 15,000 WaMu employees. <u>Apparently, they found the one employee they needed.</u>

(b)     Shortly after the deposition, CHASE voluntarily dismissed its foreclosure action in *Orozco*, withdrew Notice of Lis Pendens, and moved to seal the deposition, but copies found their way online before the protective order issued.

(c)     By Riley's own sworn admission, she was terminated from her employment

at WaMu in November 2006 — *one year prior to Plaintiff's October 19, 2007 loan.*

(d)  Plaintiff's genuine October 19, 2007 Credit Agreement would be endorsed by someone who was still employed at WaMu on October 19, 2007.

(e)  Riley's statements are further corroborated by WaMu's 2007 Form 10-K, which states on page nine, "the Company sold three administrative locations in California and Florida totaling 275,000 [ft$^2$] and leased back 145,000 [ft$^2$]."

(f)  Presumably, the "administrative locations" were closed and vacated prior to sale. CHASE is the *only* bank Plaintiff is aware of that sells occupied real estate.

(g)  Accordingly, Plaintiff avers that the October 2007 Credit Agreement CHASE produced to establish its status as a holder in due course is a counterfeit security and a forged negotiable instrument.

39.  On information and belief, CHASE placed a fraudulent and unauthorized Riley Endorsement stamp on a *photocopy* of the Plaintiff's Credit Agreement sometime after Plaintiff missed his April 2011 payment when Riley was working at CHASE in Default Operations.

40.  In short, CHASE failed to perform under the Agreement while demanding full payment and converting those funds for its own use, rendering the terms usurious and unenforceable. CHASE still sought enforcement by creating fake account numbers, counterfeit security certificates, forged documents, and false statements in violation of multiple RICO predicate acts including *usury, collecting unlawful debt,* **18 U.S.C. § 493, § 513, § 1005, § 1341, § 1343, § 1951(a), § 1956, and § 1957**.

# VI.    THE AGREEMENT

41.    On its face, the loan terms do not appear usurious because they are not. They become usurious after CHASE withheld restoring equal amounts of credit to the Credit Line balance for all principal payments as required in the terms and conditions of Plaintiff's *Fixed Rate Loan Option* (FRLO). More on that shortly. But first, a review of the collateral loan documents.

### COLLATERAL WAS PLEDGED AS SECURITY FOR HELOC LOAN NO. 0789108248 ONLY

42.    On October 19, 2007, Plaintiff executed three standard Co-op loan documents:

- Loan Security Agreement ("Security Agreement").
- Stock Power.
- Assignment of Lease.

(a)    All three provide Security and Collateral for a ***WaMu Equity Plus* Home Equity Line of Credit (HELOC) Account No. 0789108248**, *not any other account*.

(b)    Account No. 0789108248 is the only account secured by the Collateral.

### OVERVIEW OF THE WAMU EQUITY PLUS AGREEMENT AND DISCLOSURE

43.    The *WaMu Equity Plus Agreement and Disclosure* ("Agreement" or "Credit Agreement") is dated October 18, 2007 but was executed simultaneously with the three collateral documents above, which were all notarized on October 19, 2007.

44.    In any event, the *WaMu Equity Plus Agreement and Disclosure* is a 9-page document divided into eight parts. Parts I, II, III, VI, and VII are relevant to this Complaint. The eight parts that make up the Agreement are:

| I.* | GENERAL INFORMATION | V. | STATE-SPECIFIC NOTICES |
|---|---|---|---|
| II.* | VARIABLE RATE ADVANCES | VI.* | STANDARD TERMS AND CONDITIONS |
| III.* | FIXED RATE LOAN OPTION ("FRLO") | VII.* | FIXED RATE LOAN OPTION |
| IV. | FEES AND CHARGES | VIII. | BILLING RIGHTS |

**45.**     Parts I, II, and III, are summarized below:

## I.    GENERAL INFORMATION

| | |
|---|---|
| **Account Number:** | 0789108248 |
| **Credit Limit:** | $168,000.00 |
| **Maturity Date:** | 10/24/2037 |
| **Initial Draw Period:** | 120 Months |

## II.    VARIABLE RATE ADVANCES

| | |
|---|---|
| **Variable Rate Index:** | Prime rate published in the *Wall Street Journal.* |
| **Variable Rate Margin:** | -0.51% (includes 0.5% discount). |
| **Minimum Payment:** | For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") **during both the Draw Period and any Post Draw Period** (defined in Section VI.4 below) will be equal to all accrued and unpaid FINANCE CHARGES, late fees and other fees and charges described below, plus any past due amounts and any outstanding balance of your Credit Line in excess of your Credit Limit. (Emphasis added). |

## III.    FIXED RATE LOAN OPTION ("FRLO")

| | |
|---|---|
| **Type:** | Amortizing Fixed Rate Loan Option |
| **FRLO Sub-Account:** | 0789108230 |
| **Amount:** | $168,000.00 |
| **Annual Percentage Rate:** | 7.84% |
| **Term:** | 240 Months |
| **Regular Payment Amount:** (Interest plus Principal) | $1,391.93 Portion paid as interest: **$1,100** (approximately) Portion paid as principal: **$300** (approximately) |

**46.**     **Part VI** covers the **Standard Terms and Conditions** which are further divided into the following twenty (20) subparts:

Subparts of Part VI. Standard Terms and Conditions

| 1 | Promise to Pay. | 11 | Termination and Acceleration; Suspension of Advances and Reduction of Credit Limit; Other Remedies. |
|---|---|---|---|
| 2 | Credit Limit. | 12 | Delay in Enforcement; Corrections. |
| 3 | Security Instrument. | 13 | Presentment. |
| 4 | Draw Period and Post Draw Period; Payments. | 14 | Credit Information. |
| 5 | Periodic Finance Charge; Daily Periodic Rate; Annual Periodic Rate. | 15 | Transfer and Assignment. |
| 6 | Variable Rate Advances. | 16 | Notices. |
| 7 | Minimum Advances and Other Limitations. | 17 | Tax Consequences. |
| 8 | Illegal Transactions. | 18 | Special Terms. |
| 9 | Periodic Statement. | 19 | Amendment. |
| 10 | Loss or Theft. | 20 | Interpretation. |

Notably, fixed rate loans are *not* covered in the standard terms and conditions.

47.    **Part VII** covers the **Fixed Rate Loan Option** which is further divided into the following six (6) subparts:

| 1 | Introduction. | 4 | Change in Minimum Payment Following Termination of Discount |
|---|---|---|---|
| 2 | General Terms and Conditions for the Fixed Rate Loan Option. | 5 | Special Terms. |
| 3 | Choice of Terms and Minimum Payment for the Fixed Rate Loan Option. | 6* | **Conflicts.** |

48.    Importantly, Plaintiff modified his *$168,000 interest only variable rate HELOC* and turned it into a *$168,000 fully amortizing (interest plus principal) fixed rate loan on an initial draw of 100% of the credit limit*. As a result, Plaintiff committed to make regular payments of principal on the $168,000 FRLO, *not the $168,000 HELOC*. SUSPENDING ADVANCES AND REDUCING CREDIT LIMITS IS ABSOLUTELY PROHIBITED

49.    **Part VII.2** governs the *General Terms and Conditions* for the *Fixed Rate Loan Option* and states that, "the following *shall apply* to the Fixed Rate Loan Option …

15

> **VII.2(d)** The portion of the Credit Limit that is available to you for Variable Rate Advances will be reduced by the amount of each Fixed Rate Loan. *Any repayment of the principal amount of a Fixed Rate Loan during the Draw Period will restore the available Credit Limit by an equal amount.*
> (Emphasis on mandatory terms "*shall apply*" and "*will restore*").

50.    The reason suspending advances and reducing credit limits is prohibited under these circumstances is easy to explain. Plaintiff voluntarily agreed to a pre-set schedule of amortizing payments. WaMu determined the payment schedule, so CHASE is required to restore an equal amount of paid principal to the Credit Line balance. As long as CHASE continues to demand payment of principal, it cannot refuse to restore the Credit Line by an equal amount. That is the easy explanation.

51.    Sophisticated and technical contract interpretation yields the same result. Part **VII.6** sets the rules for resolving tension between competing provisions:

> **Part VII.6. Conflicts.** In the event of any conflict or inconsistency between the provisions of this Section VII and the remaining provisions of this Agreement, the provisions of this Se4ction VII shall prevail. Except as otherwise provided in this Section VII, all remaining provisions of this Agreement shall apply to the Fixed Rate Loan in accordance with their terms.

The conflict between: **(1)** provisions permitting CHASE to suspend advances or reduce credit limits **[Part VI.11(b)]** *and* **(2)** restoring the available credit limit by an amount equal to the fixed rate loan principal payments **[Part VII.2(d)]** must resolve in favor of CHASE restoring the Credit Line balance, not arbitrarily suspending advances and reducing limits. This is especially true because extra principal payments to the FRLO and immediate restoration of credit were mutually agreed to in the original terms of the Credit Agreement. Accordingly, suspending additional advances or reducing Credit Limits are in direct conflict with the express terms of the Credit Agreement and are therefore *void with no force or effect*.

52.     CHASE's noncompliance with the express terms constitutes a material breach.

SINCE AT LEAST JANUARY 2009, CHASE DEMANDED PRINCIPAL PAYMENTS YET REFUSED TO RESTORE THE AVAILABLE CREDIT LIMIT BY AN EQUAL AMOUNT

53.     The only reason Plaintiff agreed to make regular payments of principal is because he expected an equal amount to become available as credit for his use and benefit in the future. *Otherwise, he would have elected to make interest only payments*.

54.     However, upon acquiring WaMu's servicing portfolio which included Plaintiff's HELOC Account No. 0789108248 and his FRLO Account No. 0789108230, CHASE demanded performance of the extra principal payments for over 27 months without ever performing its obligation under the same contract.

55.     Specifically, on May 31, 2018, Suzanne L. Story, *Document Review Senior Specialist III* for CHASE reviewed Plaintiff's payment and transaction history for his HELOC and FRLO accounts and swore under penalty of perjury to the truth and accuracy of those records which showed the following FRLO principal payments on:

### Fixed Rate Loan Principal Payments

| | |
|---|---|
| January 1, 2009: | $629.05 |
| February 1, 2009: | $922.97 |
| March 1, 2009: | $966.01 |
| March 7, 2009: | $754.52 |
| April 1, 2009: | $511.84 |
| April 20, 2009: | $1,345.29 |
| May 15, 2009: | $357.65 |

56.     CHASE failed to restore the available Credit Limit by an equal amount from January 1, 2009 until Plaintiff's finally defaulted in April 2011. The appropriate

equitable remedy is to treat Chase's default in performance as an election to terminate the Credit Line pursuant to **Part VI.11(a) and (c)**.

CHASE'S FAILURE TO PERFORM UNDER FIXED RATE LOAN TERMS IS USURY AND THE ONLY PREVENT CHASE'S MATERIAL BREACH IS TO TERMINATE THE CREDIT LINE

57.    The practical effect of dissolving the FRLO Account No. 0789108230 and restoring the original interest only payment terms would result in the following:

- Payment demanded from CHASE: **$1,388.98**
- Outstanding Credit Line balance: **$162,547.43** (as of July 24, 2009)
- Effective interest rate CHASE charged: **10.25%**

58.    Thus, by demanding payments of $1,388.98, CHASE was collecting 10.25% interest on the Credit Line balance of $162,547.43 in July 2009.

- *That is 4.5 times the stated rate of 2.23% according to Credit Agreement.*
- *Charging 10.25% interest when prime is only 2.74% is legal usury.*
- *Wherefore, CHASE sought to collect and did in fact collect an unlawful and usurious debt in violation of federal usury laws.*

59.    *Even if a rate of 10.25% is not statutory usury, it is morally unconscionable and should be declared void as unenforceable in the interest of justice.*

60.    This concludes Plaintiff's review of the terms of his Credit Agreement. Next, Plaintiff raises allegations of extortion, money laundering, mail/wire fraud, counterfeiting and forgery of private securities in violation of RICO.

## VII.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

61.    Before DIMON or J.P. Morgan, Chase Manhattan Bank ("CMB") was a reputable and respectable bank that positively enhanced interstate commerce by consistently conducting its banking business in good faith with honesty in fact and always treated its customers fairly. Plaintiff knows because he acquired the title to his first Co-op apartment from CMB as a bank-owned foreclosure. Unlike DIMON's CHASE, *CMB did not sell the unit while its customer was still living inside*.

62.    On July 11, 2002, Chase Manhattan Mortgage Corporation, a wholly owned subsidiary of CMB, assigned a Proprietary Lease for Unit R-1B at 7101 Colonial Rd., Brooklyn, NY to the Plaintiff. Jennifer Bernstein, a CMB representative, executed the assignment. The assignment was notarized by the Plaintiff's counsel, Mr. Garber. A copy of the assignment is attached hereto and made a part hereof.

63.    Plaintiff highlights the following sequence of events for illustrative purposes:

- CMB sold a *vacant, unoccupied* bank-owned apartment.
- CMB was in possession of the apartment at all times prior to sale.
- CMB's realtor had keys and unrestricted access to the apartment.
- CMB assigned the Proprietary Lease to the Plaintiff.
- CMB surrendered its Stock Certificate to the Co-op Transfer Agent.
- The Co-op Transfer Agent added the Plaintiff's name to the books and records of the Co-op and issued a new Stock Certificate to the Plaintiff.
- Plaintiff would never purchase an apartment without seeing it.
- Plaintiff would never purchase an apartment that was occupied unless it was being delivered vacant at the time of closing.
- Plaintiff would never trust a realtor selling an apartment they cannot access and are not permitted to enter.

64.    With modest upgrades to the kitchen and bathroom, Plaintiff sold the apartment in 2005 for $215,000 and a 340% return over 3 years. If a 25-year-old can profit honestly with a little effort, lawyers and Wall Street executives of 25 years should not have to destroy lives and break laws to do the same.

(a)    Plaintiff could have used the $150,000 profit many ways. He could have purchased an expensive car, went on lavish vacations, or used it for a down payment on a million-dollar mansion with a jumbo mortgage he could not afford.

(b)    Instead, he used it to purchase a second bank-owned property in cash, *without financing*. This second purchase is the subject Unit.

PLAINTIFF WAS A *BONA FIDE* PURCHASER FOR VALUE AND ACQUIRED THE SUBJECT UNIT AS A BANK OWNED PROPERTY FROM A GOOD FAITH SELLER IN POSSESSION

65.    On December 1, 2005, Plaintiff acquired title to the subject Unit from Investor's One Corp ("IOC") as a bank-owned foreclosure for $117,000 in cash without financing. Closing documents are attached hereto. Plaintiff satisfied his due diligence requirement for *bona fide* purchaser status when he:

- Scheduled an appointment with the realtor to view the Unit.
- Made sure the realtor had a key and permission to go inside the Unit.
- Made sure the apartment was vacant and unoccupied.
- Made a reasonable offer to purchase the apartment.
- Scheduled the closing as soon as possible, time being of the essence.
- Scheduled a 2nd walk-through on the eve of closing to make sure the Unit remained vacant and unoccupied.
- Secured a set of keys to the Unit at the closing.
- Came into immediate possession of the Unit after closing.

66.    The closing took place at PLLC law office. YORAM was present and

represented the Co-op as their *Attorney/Transfer Agent*. In that capacity, he:

- Notarized Plaintiff's signature on the closing documents.
- Registered Plaintiff as owner of 582 shares of stock in the books of Y-CORP.
- Issued Stock Certificate No. 134 representing 582 shares to the Plaintiff.

67.    IOC satisfied the requirements of a good faith seller because they:

- Sold a vacant, unoccupied apartment.
- Were in possession of the apartment at all times prior to sale.
- Provided its realtor with keys and unfettered access to the apartment.
- Confirmed no other individual or entity had any claims to the apartment.

68.    In sum, the Plaintiff as buyer and both CMB and IOC as bank sellers, *all acted in good faith, with honesty in fact, and conducted their business fairly*.

69.    Conversely, the Defendants' July 25, 2016 transfer is the opposite of good faith.

PLAINTIFF RENOVATED THE ENTIRE UNIT AND ADDED A SECOND BEDROOM

70.    In 2006, Plaintiff consulted with YORAM about renovating the apartment, including plans to section off the open floor space to create a second bedroom or small office. YORAM liked the idea and said it might pay for itself.

(a)    Plaintiff used a $100,000 HELOC from CHASE and actively managed the project by creating the design, ordering all the material, and hiring three independent contractors for the bathroom/plumbing, kitchens/cabinets/closets, and floors/walls. Renovations took several months to complete because everything was custom-fitted and specially ordered, from the recessed lights down to the designer toilet bowl, jacuzzi tub, custom closets and cabinets, floor to ceiling bathroom tiles, stainless steel appliances, crown molding, and specialty paint. The project was completed in December 2006 at a total cost of $70,000 with the addition a second bedroom.

### Plaintiff Started A Home Improvement Contractor Business

**(b)**    Many building residents, including two board members, were impressed with the renovations, and said it was the nicest unit in the building. About a dozen neighbors stopped by and asked for a tour of the apartment over the holidays.

71.    Feedback was so positive, Plaintiff decided to put his business and sales background to use and started his own construction company. Plaintiff filed articles of incorporation in NY for A-1 American Roofing & Chimney, Inc. ("A-1") in May 2007. Stock, licensing, and insurance certificates are attached.

72.    Plaintiff's newly renovated two-bedroom luxury apartment appraised for $210,000. So, on October 19, 2007, Plaintiff refinanced the CHASE HELOC with the WaMu Credit Agreement under the terms summarized above. Plaintiff drew 100% of the HELOC but planned to pay down 50% within two years once his new business was fully operational.

### On September 25, 2008, Chase Acquired WaMu in a Voluntary Sale From the FDIC Pursuant to 12 U.S.C. § 1821(d)(2)(G)(i)(II), Not By Operation of Law

73.    While the Plaintiff was busy getting his new business off the ground, DIMON and CHASE were busy tearing WaMu down. On September 25, 2008, Chase purchased the assets and certain liabilities of WaMu pursuant to a *Purchase and Assumption Agreement* ("PAA") with the FDIC as Receiver for WaMu.

**(a)**    Importantly, CHASE *did not* acquire the assets by operation of law. They were acquired in a voluntary sale from the FDIC per 12 U.S.C. § 1821(d)(2)(G)(i)(II). See *Kim v. JPMorgan Chase Bank, N.A.*, 825 N.W.2d 329 (Michigan Sup. Ct., 2012).

**(b)**    The FDIC agreed with the Michigan Supreme Court and rejected the idea

that CHASE somehow magically owns every loan WaMu originated by operation of law pursuant to the PAA. Specifically, a *Stipulation and Release Agreement* with JPMC dated November 19, 2013 contains the following clause at ¶ 13:

> "13. **No Acknowledgment or Admission.** *Nothing in either this Agreement or the DOJ Agreement shall constitute an admission or imply that JPMorgan Chase Bank, N.A. or any of its subsidiaries or affiliates became successor-in-interest to Washington Mutual Bank* [***] when JPMorgan Chase Bank, N.A. purchased the assets and assumed certain liabilities of Washington Mutual Bank pursuant to the Purchase and Assumption Agreement dated September 25, 2008 between JPMorgan Chase Bank, N.A. and the Federal Deposit Insurance Corporate in its corporate capacity and its capacity as Receiver for Washington Mutual Bank." Settlement and Release Agreement at ¶ 13. (Emphasis added).

    **(c)**    It is remarkable to witness the FDIC flatly reject the very argument CHASE has flaunted in courts across the country for years.

74.    Assuming *arguendo*, even if CHASE "*became successor-in-interest to Washington Mutual Bank*" by operation of law pursuant to the PAA, such an operation would only allow CHASE to enforce WaMu loans in a judicial foreclosure, *not a UCC Article 9 sale*.

    **(a)**    Clearly, the law does not operate outside on the steps of the Courthouse which is where CHASE claims to have acquired Plaintiff's security interest during the unlawful operation of a non-judicial, non-valid public sale on September 20, 2012.

75.    Moreover, upon information and belief, WaMu severed Plaintiff's FRLO Account No. 0789108230 from his secured HELOC Account No. 0789108248 when it securitized the FRLO and sold it to institutional investors as part of the Washington Mutual Preferred Funding Trust IV ("Trust Security").

    **(a)**    The Civil and Supreme Courts issued judicial subpoenas to determine if the

loans were packaged and sold into a Trust Security.

(b)    CHASE refused to comply with the subpoena. Instead, CHASE dispatched an attorney to appear on the first day of the Holdover trial to regurgitate the same tired story **claiming**, "CHASE became successor-in-interest to Washington Mutual Bank [*by operation of law pursuant to the PAA*.]." As previously explained, that argument was explicitly **disclaimed** by both FDIC *and* JPMC in paragraph 13 of their *Stipulation and Release Agreement* five years earlier on November 19, 2013.

CHASE REFUSED TO PERFORM UNDER THE TERMS OF THE AGREEMENT

76.    Regardless of who owned WaMu's loans, it is undisputed that CHASE acquired WaMu's servicing portfolio and was therefore responsible for performing the duties owed to the Plaintiff under the terms of the Credit Agreement ("Agreement").

(a)    Initially, the Agreement was a valid and enforceable contract for a revolving fixed rate, amortizing Credit Line that was secured by Title to Plaintiff's Co-op Unit.

CHASE RELEASED ITS SECURITY INTEREST IN JULY 2009

77.    On July 23, 2009, CHASE closed HELOC Account No. 0789108248. *See* **A77**.

(a)    At all times relevant since **HELOC Account No. 0789108248** was opened on or about October 30, 2007, the average daily balance was always zero. Since there was nothing owed on the HELOC, the security agreement was satisfied.

78.    On July 24, 2009, CHASE transferred a naked and unsecured FRLO Account No. 0789108230 to a CHASE unsecured Loan No. 429400108248.

(a)    CHASE gave the new, unsecured Loan the same last four digits as the HELOC that was closed one day earlier so Plaintiff never realized the HELOC closed.

24

<u>THE DEFENDANTS ALL KNEW THE UNIT WAS OCCUPIED BY ITS OWNER YET STILL PROCEEDED WITH THEIR ILLEGAL PURCHASE AND SALE</u>

79.    In a sworn Affidavit dated April 9, 2017, **Yoram Nachimovsky, Esq.** states:

1.  I purchased unit 3J at 2939 Avenue Y, Brooklyn, New York in July 2016. I hold the original stock and lease to the same.

2.  This motion should be denied because it is a dilatory tactic. It was brought on the eve of the Housing Court trial. The two actions have insufficient nexus as to warrant consolidation.

3.  Plaintiff is claiming conduct on my part which took place in 2006-2007 injured him almost 10 years later. Notwithstanding the obvious statute of limitations issue, the Housing Court [proceeding] is brought to evict the Plaintiff based on my purchasing a unit from JP Morgan Chase that the Plaintiff had previously owned from 2006 to 2012.

<u>4</u>.  When I purchased the unit from JP Morgan Chase **<u>I was advised Chase purchased this unit from an auctioneer (from a non-judicial sale). The auctioneer's paperwork is attached hereto. I was further furnished with proof of publication of the sale</u>**. [*Emphasis added*].

5.  I was also made aware that JP Morgan Chase (as well as the Plaintiff) were signatories to a loan Recognition Agreement and that JP Morgan Chase was within its rights to conduct a non-judicial sale cause by a default on the Plaintiff in the terms of the loan.

6.  This, to any reasonable inquiry, convinced me that JP Morgan Chase held a title to Unit 3J.

<u>7</u>.  **<u>I was further advised that the unit is occupied by the individual who defaulted on this loan</u>** and has long since stopped paying maintenance on the apartment. [*Emphasis on admitted material fact*].

<u>8</u>.  I purchased this unit by paying $50,000.00 to Chase and the reason for the reduced price was that **<u>the unit was occupied</u> <u>and it was costing Chase money every month to maintain said unit</u>**. [*Emphasis on occupied unit*].

9.  Since July 2016, I have been trying to evict the Plaintiff from my unit. I am told that the Plaintiff has not paid any maintenance from 2012 to the date I purchased the unit. He has not paid me any rent since.

<u>10</u>. **<u>I represent 2939 Avenue Y Tenants Corporation as their attorney</u>** for a number of years. In fact, in 2006, **<u>I was the transfer agent for the Cooperative when the Plaintiff acquired unit 3J.</u>** He was represented by counsel at the time [*Emphasis on Attorney/Transfer Agent admission*].

11. Sometime in 2007 the Plaintiff sought to take out a loan secured by the stock and lease of unit 3J. As part of my duty to 2939 Avenue Tenants Corp. I reviewed the Recognition Agreement between the Plaintiff, the Coop and

JP Morgan Chase. The ONLY party I represented was 2939 Avenue Y Tenants Corp.

12. 2939 Avenue Y Tenants Corp was notified by Chase that Chase auctioned its collateral [*sic*] to due to a default in payment of $84,980 of outstanding obligation under the loan. They were also provided with copies of the newspaper advertisements of the sale and the auctioneer's bill of sale. I am told that Chase's agents, and not the plaintiff, were paying the ongoing maintenance.

13. **Several years later I was offered this unit for sale by a realtor** (Exhibit F). **I was advised that I was buying an occupied unit.** I went into contract and **tendered the funds and the Coop issued a new Stock and Lease in my name** following the Board Approval of the purchase. [*Emphasis added to a realtor-facilitated monetary transaction*].

14. I am a bona fide purchaser of unit 3J at 2939 Avenue Y, Brooklyn, NY.

*Affidavit of Yoram Nachimovsky*, ¶¶ 1 to 14. *See* **A9-A11**.

80.    Contrary to YORAM's contention, it takes more than Board approval and money to qualify as a *bona fide* purchaser *when you know the owner lives there*.

81.    In his September 2, 2016 Holdover Petition ("HP"), YORAM alleged that:

5. On or about September 20, 2012 the 582 shares of stock of 2939 AVENUE Y TENANTS CORPORATION (the "Shares") and proprietary lease appurtenant to the premises was sold at auction by Victor Rawner, licensed auctioneer, to JP Morgan Chase Bank, NA following proper publication and service of the Notice of Sale (copies of which are attached hereto as Exhibit A). Said sale was for the liquidation of Chase's security interest in the stock and proprietary lease for the above referenced premises pursuant to **Loan #000000010726568**. [*Emphasis on loan number starting with 7 zeros*].

6. Thereafter, on July 25, 2016 the 582 shares of stock of 2939 Avenue Y TENANTS CORPORATION and proprietary lease appurtenant to the premises were sold to Yoram Nachimovsky, the Petitioner in this action, as evidenced by the Stock Certificate and first page of proprietary lease attached hereto as Exhibit B. *Holdover Petition* at ¶ 5.

   **(a)**    YORAM provided *prima facie* evidence of the auction, publication, and notice to the Plaintiff at Exhibit "A" of the HP.

   **(b)**    However, ***Yoram offers zero evidence of Loan # 000000010726568***.

82.    Instead of confirming Loan #000000010726568, YORAM relied on the

following unverified reference in RRA's August 28, 2012 *Notice of Sale* at Exhibit "A":

| RE: | JPMorgan Chase Bank, N.A. v. AHMED ELNENAEY ; et al. |
|---|---|
| | **Premises:** 2939 AVENUE Y APT 3J, BROOKLYN, NY 11235 |
| | **Loan #:** 000000010726568 |

Dear Sir or Madam:

Enclosed please find a Notice of Sale for the liquidation of our client's security interest in the Stock and Proprietary Lease, for the above referenced premises. Please note that this sale will take place on September 20, 2012 at 10:00 AM at the foot of the Courthouse steps, facing Adams Street, of the Supreme Court of the State of New York, County of Kings, located at 360 Adams Street, Brooklyn, NY 11201 according to the annexed Notice of Sale.

83.     Since Plaintiff was never in default of a Loan #000000010726568, the purported sale of 2012 and YORAM's current Title are void *ab initio*.

84.     Plaintiff received a CHASE letter dated August 2, 2011 with Subject Header:

**Your Account Has Been Referred to the Homeowner Assistance Department**
Account: 000000010726568 (the "Loan")
Property Address:     2939 AVENUE Y APT 3J
                                  BROOKLYN, NY 11235 (the "Property")

85.     A similar letter from CHASE dated October 3, 2011 states:

**We may have a solution to resolve your delinquency**
Account: 000000010726568
Property Address:     2939 AVENUE Y APT 3J
                                  BROOKLYN, NY 11235

86.     After receiving the second letter in October 2011, Plaintiff replied with a handwritten note on 10/25/11 directly on the face of the letter stating he does not recognize the account and asked to have it closed. Plaintiff returned the letter with his handwritten note to Chase at Ridgepoint Drive in Irving, Texas by first class mail.

87.     *There is no such delinquent account. There is no such account in delinquency.*

    (a)     CHASE demanded payment for a non-existent Loan # 000000010726568.

    **(b)**    CHASE threatened to foreclose on a non-existent Loan #000000010726568.

    **(c)**    Both letters from CHASE are attached hereto and made a part hereof.

88.    CHASE enlisted the services of RRA, a third-party debt collector to collect on Plaintiff's non-existent <u>Loan Account No. 000000010726568</u>. Plaintiff received correspondence from Daniel Wade, Esq. a RRA attorney. The three-page letter dated February 14, 2012 referenced:

> Re:        Premises: 2939 AVENUE Y APT 3J, BROOKLYN, NY 11235
> Loan No.:   000000010726568

Said letter was prepared on RRA's letterhead and provided the following:

> Please be advised that this law firm has been retained to commence appropriate legal proceedings to foreclose the lien on the stock and proprietary lease held by JPMorgan Chase Bank, N.A. in the above-referenced cooperative apartment by reason of your default in making the monthly payments due pursuant to your loan agreement. This firm is relying on the accuracy of the information provided by our client. ... ... ...
>
> **1.**    **As** of February 14, 2012, **the following sums are in arrears and owed to JPMorgan Chase Bank, N.A.:**
>     a.  Monthly Payments    $15,278.78
>     b.  Late Charges        $376.83
>     c.  NSF               $75.00
>     **d.  Present Arrears**     **$15,730.61**
>
> **2.**    **The amount of the Debt: the total amount to payoff the loan as of February 17, 2012 is $165,346.26 consisting of unpaid principal of $153,271.91; interest of $11,622.52; late charges of $376.83; NSF Fees of $75.00.**
>
> **3.**    **The name of the creditor to whom the debt is owed is JPMorgan Chase Bank, N.A. ... ... ...**
>
> The originating creditor of your loan is Washington Mutual Bank. ... ... ...
>             **PAYMENT REMITTANCE INFORMATION**
> **ALWAYS INCLUDE LOAN #000000010726568 WITH YOUR PAYMENT**

89.    Six months later, the ROSICKIS instructed a different RRA associate attorney named Simone De Melo, Esq., to send the Plaintiff additional written correspondence. De Melo's correspondence referenced:

RE:    **JPMorgan Chase Bank, N.A. v. AHMED ELNENAEY ; et al.**
Premises:    **2939 AVENUE Y APT 3J, BROOKLYN, NY 11235**
Loan #:    **000000010726568**

Dear Sir or Madam:

Enclosed please find a Notice of Sale for the liquidation of our client's security interest in the Stock and Proprietary Lease, for the above referenced premises. Please note that this sale will take place on September 20, 2012 at 10:00 AM at the foot of the Courthouse steps, facing Adams Street, of the Supreme Court of the State of New York, County of Kings, located at 360 Adams Street, Brooklyn, NY 11201 according to the annexed Notice of Sale.

We will sell to the highest qualified bidder at a public sale the shares and proprietary lease for 2939 AVENUE Y APT 3J, BROOKLYN, NY 11235. The secured party JPMorgan Chase Bank, N.A. can be contacted at, 800-848-9380.

90.    There is nothing securing the non-existent Loan # 000000010726568.

(a)    RRA demanded $15,730.61 on the non-existent Loan #000000010726568.

(b)    RRA threatened to foreclose on a non-existent Loan #000000010726568.

91.    Plaintiff was shocked to learn CHASE was about to foreclose on a loan that does not exist, so he sent RRA a reply in writing to dispute the debt, request verification of Loan #000000010726568, and inform RRA that there is no such loan.

(a)    RRA and Plaintiff's letters are attached hereto and made a part hereof.

92.    On September 20, 2012, Plaintiff attempted to repossess his Stock Certificate and Proprietary Lease from the Auctioneer prior to the auction time. However, the Auctioneer had neither the Stock Certificate nor Proprietary Lease. Plaintiff handed the Auctioneer a copy of his dispute letter addressed to De Melo at RRA.

93.    Apparently, *CHASE liquidated invisible Collateral to a non-existent Loan.*

CONSCIOUS AVOIDANCE IS THE LEGAL EQUIVALENT OF KNOWLEDGE

94.    Defendants cannot maintain their innocence with bald assertions that they lacked knowledge or intent to engage in a scheme to defraud Plaintiff and deprive him of his property. Nor can they claim accident, mistake, or neglect. Moreover, ignorance, incompetence, and indifference are all inadequate to excuse their willful conduct because intentional blindness is not a defense. Defendants could and should have recognized several discrepancies that put them on notice that further inquiry was necessary.

95.    For example, the closing documents all refer to Loan # 000000010726568. In fact, the wiring instructions from RRA to YORAM direct him to reference the Loan Account # 000000010726568. The same loan number is on the HUD Settlement form.

96.    However, CHASE provided YORAM with the Driver Affidavit of Lost Security in lieu of the Plaintiff's original Stock and Lease. The Affidavit references Loan # 429400108248 not 000000010726568. For some reason, nobody noticed.

97.    Two different loans cannot be secured by the same Collateral. Yet, Driver's *Affidavit of Lost Security* references **Loan 429400108248** while the basis for UCC Article 9 Sale and all prior collection efforts by RRA referenced **000000010726568**.

98.    As the admitted Transfer Agent, it was YORAM's responsibility to notice clear discrepancies in loan numbers, requiring additional proof of Plaintiff's security agreement and default, *before proceeding to cancel Plaintiff's Title on July 25, 20016.*

99.    The same standards apply to the ROSICKIS and RRA. However, none of the lawyers at RRA noticed that the same Collateral was securing two different loans.

100.    CHASE even sent RRA the entire Collateral file in April 2015 to start a judicial foreclosure action. The Collateral file contains all Collateral documents that bear the correct Loan number, **<u>0789108248</u>**. RRA could have reviewed it and even shared it with YORAM prior to the closing one year later. They did not. This creates an entirely different set of problems for the Defendants because it indicates they knew the 2012 non-judicial sale was invalid otherwise they would not need to seek a judicial foreclosure process when you already completed a non-judicial sale in 2012.

<u>CLEAR EVIDENCE OF PLANNING, COORDINATION, AND CONCEALMENT</u>

101.    There is overwhelming evidence at every stage of the Defendants' scheme to show common purpose, planning, and coordination in executing their fraudulent scheme of depriving the Plaintiff of his property by conducting an illegal sale and fake transfer of a counterfeit Certificate representing the Plaintiff's 582 shares of Y-CORP stock, cancelling the same, and replacing it with a clean title for YORAM by YORAM.

102.    First, the 2012 UCC sale and 2016 Holdover were both in September. This random fact does not, without more, provide evidence of planning or coordination. However, <u>serving the Plaintiff with the HP on the day after a four-year statute of limitations has run certainly does</u>.

| Page # | Event | Occurred on this Date |
|---|---|---|
| | UCC Article 9 Sale Conducted On | September 20, 2012 |
| | Service of the Holdover Petition Postmarked On | September 21, 2016 |

**(a)**    UCC § 2-725 states,

"***<u>[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued</u>***. … A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." <u>UCC § 2-725(1)</u>.

**(b)**    Defendants' failed to realize the statute does not apply to void transfers.

**(c)**    Defendants cannot even invoke any rights or rules from the UCC because everything in the UCC is based on a presumption that parties act in good faith with honesty in fact. *__That is quite literally the exact opposite of the Defendants conduct__*.

**(d)**    Notwithstanding their poor understanding of the law, the peculiar timing suggests a pre-meditated attempt to hide their fraud by avoiding legal challenges.

**(e)**    Plaintiff also ruled out the possibility that the seemingly coordinated timing might be the result of a random coincidence. But the likelihood of YORAM randomly serving the HP on September 21, 2016 rather than any other date in the 2016 calendar year is 1 out of 366 days or 0.27%.

**103.**    Given the seriousness of an Enterprise corruption accusation, a 0.27% chance of error is unacceptable which is why the Plaintiff identifies corroborating evidence that rules out any possibility that chance had a role in the peculiar timing of events.

**(a)**    Plaintiff relies on the actual evidence YORAM produced to support his sensational claim that he learned about the apartment from a realtor and he made an offer to purchase the Unit which CHASE accepted.

**(b)**    Specifically, Yoram produced a copy of his purported Purchase Offer with *Tom Marco Real Estate, Inc.* for the subject Unit. **Apg**. Apparently, YORAM offered CHASE $50,000 on **July 2, 2015** for the Unit. The closing was on July 25, 2016 — *more than one year later*.

**(c)**    Obviously, if YORAM closed in July 2015 like the handwritten closing date suggests, it would be odd if he waited until September 2016 to evict the Plaintiff.

**(d)**    Indeed, coordinating the service of eviction papers after a perceived 4-year limitations period has run is quite possibly the only reason Defendants waited over one year to finalize a simple, $50,000 *cash real estate purchase* where the buyer (YORAM) is also the *Co-op Attorney/Stock Transfer Agent* and the seller (CHASE) is not burdened with closing on a new house, packing, or vacating the apartment.

104.    It is incredible to think CHASE would wait an entire year before accepting a $50,000 offer, especially if it was paying the monthly maintenance as YORAM said.

**(a)**    This FACT disproves YORAM's theory that CHASE accepted a reduced price of $50,000 because the Unit was occupied, and it was costing CHASE money each month to maintain the Unit.

**(b)**    Both explanations lack merit because if they did not want to continue paying maintenance each month, they would have closed in 2015, not 2016. Similarly, CHASE had an extra twelve months between 2015 and 2016 to remove the Plaintiff from the Unit through judicial process. They did no such thing.

105.    In sum, $50,000 would be an unreasonably low price for CHASE to accept. If it possessed the original Title. However, if YORAM and CHASE both knew it was a Counterfeit Title, then $50,000 makes perfect sense. Unfortunately, it would mean they committed multiple predicate RICO violations.

106.    Defendants' ongoing coordination, communication, and planning between the (1) YORAM and PLLC group and (2) the ROSICKIS, RRA, and PLI group is further evidenced by the following related events:

**(a)**    At a status conference in the Supreme Court action on February 26, 2018,

Plaintiff noted that CHASE never filed a UCC-3 Termination Statement for his secured loan CHASE allegedly acquired from WaMu by operation of law, even after selling the Title to YORAM, allegedly.

(b)     Two days later on February 28, 2018, a UCC-3 Termination Statement was mysteriously filed by PLI on February 28, 2018. **Really**!

107.    Additional evidence of planning, coordination, and concealment includes:

(a)     CHASE and RRA coordinated responses to two judicial subpoenas.

(b)     CHASE and PLLC collaboration on subpoena production.

(c)     YORAM and RRA $45,163.30 wire transfer on July 25, 2016.

108.    Plus, not a single Defendant sought judicial intervention since 2012!

[Remainder of page blank]

# VIII.    CAUSES OF ACTION

## **COUNT ONE**

### VIOLATIONS OF THE RICO STATUTE, 18 U.S.C. §§ 1961-1968
### Against All Defendants

109.    The preceding paragraphs are adopted here, in Count I.

110.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3).

111.    Plaintiff is a "person injured in his business or property by reason of a violation of section 1962 of this chapter," within the meaning of 18 U.S.C. § 1964(c).

### THE ENTERPRISE

112.    At all times relevant, each and every Defendant was and is a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

113.    At all times relevant, the RICO "Enterprise" was and is a group of individuals associated in fact as the term is defined in 18 U.S.C. §§ 1961(4), 1962(c), consisting of each Corporate Defendant and their respective principals, owners, officers, directors, Board members, employees, agents and subsidiaries (the "Enterprise").

114.    The Enterprise is separate and distinct from the persons in the Enterprise.

115.    The Enterprise corruption is separate from the legitimate banking, law practice, and title search businesses of the Corporate Defendants.

116.    Defendants are not the entire Enterprise but are the perpetrators of the alleged racketeering activity targeting the Plaintiff.

117.    The Enterprise was and is engaged in activities that affect interstate commerce. Here, the states affected include New York, Arizona, and Louisiana.

118.    The Enterprise has been in operation since Defendant JPMORGAN CHASE

BANK, N.A. acquired Washington Mutual Bank on September 25, 2008.

119.    The Enterprise corruption is ongoing, open ended, and continuous. Even now, Plaintiff is still being threatened with a frivolous and unlawful ejectment. Said Decision/Order is on appeal in the Second Department, <u>Docket No 2020: 03220/03224</u>.

<u>THE PATTERN OF RACKETEERING ACTIVITY</u>

120.    At all times relevant, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint. The Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof through the conduct below.

(a)    Starting from at least 2008, DIMON and the rest of the JPMC Leadership Team put a plan into motion that would drive WaMu into receivership and enable CHASE to acquire only WaMu's assets at a fire sale for less than 10% of its fair value.

<u>FIRST PREDICATE ACT: COLLECTION OF AN UNLAWFUL DEBT</u>

121.    As the term is defined in the RICO statute, an "unlawful debt" includes a debt, "which was incurred in connection with the … business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6)(B).

(a)    According to the Credit Agreement, Plaintiff's enforceable rate for variable rate advances is 0.51% below the prime rate, which on January 1, 2009 through September 2012 and beyond was constant at <u>**2.74%**</u>. Thus, <u>the enforceable rate based on the Credit Agreement is 2.23% and any rate above 4.46% is unlawful and usurious</u>.

(b)    Shortly after acquiring WaMu's assets, CHASE began suspending, reducing, and cancelling thousands of WaMu HELOCs, including the Plaintiff's.

(c)    Moreover, the general terms and conditions of WaMu's HELOC contracts permit the bank to suspend and/or reduce HELOCs if certain conditions are satisfied.

(d)    However, those provisions do not apply to the Plaintiff's Credit Agreement because they conflict with the special terms and conditions in Plaintiff's FRLO which requires CHASE to, "*__restore the available Credit Limit by an equal amount__*" every time a payment is applied to the principal fixed rate loan balance.

(e)    Plaintiff made twenty-seven (27) consecutive monthly payments of principal starting January 2009 through March 2011. *__CHASE never restored the available Credit Limit by even one dollar, and certainly not an equal amount__*.

(f)    The only way CHASE can decline to restore the available Credit Limit *without* breaching the contract is by Termination and either: (1) acceleration of the entire FRLO or by (2) converting the FRLO to the variable rate HELOC with minimum interest only payments at the variable rate of 2.23%, *not the fixed 7.84%*.

(g)    Option 1 would cause $162,547.43 to become immediately due.

(h)    Option 2 would actually benefit the Plaintiff because it would reduce the regular amortizing payments of $1,388.98 at 7.84% plus principal to an interest only payment of about $300.00 at 2.23%. So, CHASE refused to perform while demanding $1,388.98 each month from the Plaintiff and is clear usury and exploitation.

(i)    CHASE still demanded monthly payments of $1,388.98. So, **a minimum, interest only payment of $1,388.98 on a balance of $160,000 translates into a**

**10.42% interest rate which is over 4 times the enforceable rate of 2.23%.**

**(j)**    Since the effective interest rate charged by CHASE is more than twice the enforceable rate, it is usury, and the collection of a usurious debt is unlawful.

**(k)**    Alternatively, or in addition, charging 10.25% when the stated rate is 2.23% is morally unconscionable and should therefore be declared unenforceable.

**(l)**    Each month CHASE collected $1,388.98 constitutes a separate predicate act of collecting an unlawful debt. Thus, CHASE collected an unlawful debt for 27 consecutive months between January 2009 and April 2011 *before Plaintiff's default*.

SECOND PREDICATE ACT: EXTORTION, ATTEMPTED EXTORTION, AND CONSPIRACY TO EXTORT (HOBBS ACT) AND COLLECTION OF EXTENSIONS OF CREDIT BY EXTORTIONATE MEANS (18 U.S.C. § 943):

**122.**    The preceding paragraphs are adopted here, in the Second Predicate Act.

**123.**    After 27 consecutive months of forced financial servitude and maliciously slandering Plaintiff's credit score by falsely reporting the FRLO as a revolving credit line account with a balance of $162,547.43. Plaintiff's revolving credit became fully leveraged at 96.5%. CHASE finally succeeded with procuring the Plaintiff's default when he missed his first payment installment in April 2011.

**124.**    There are multiple grounds for Plaintiff's extortion claim, including: (1) wrong loan number 000000010726568, (2) unlawful debt, (3) CHASE is not a holder in due course, and (4) Plaintiff was not in default as demonstrated by the following:

**(a)**    CHASE tried to collect an extension of credit through extortionate means when it referred the unlawful debt to an outside collection agency and then again when it threatened to foreclose on the Plaintiff's property.

**(b)**    RRA and the ROSICKIS are also guilty of extortionate acts in connection with its debt collection practices. Plaintiff received written correspondence from Daniel Wade, Esq. an attorney at RRA dated February 14, 2012 demanding payment of $15,730.61 which constitutes extortion because it seeks to collect an unlawful debt.

**(c)**    A letter dated August 28, 2012 from Simone De Melo, Esq. an attorney at RRA, threatened to sell the Plaintiff's Co-op Stock and Lease at a public sale. This correspondence also constitutes extortion and attempted extortion.

125.    Finally, YORAM and PLLC are guilty of conspiracy to extort because they aided and abetted the extortionate acts by allowing CHASE and RRA to skip court.

**(a)**    If YORAM required CHASE to obtain a judicial determination of its Title, there could be no extortion and this entire fraudulent scheme would have been thwarted in 2012 instead of destroying half of the Plaintiff's adult life. The only reason extortion was even possible is because YORAM and PLLC are a part of the corrupt Enterprise and turned a blind eye to RICO violations of their co-conspirators.

THIRD PREDICATE ACT: LAUNDERING OF MONETARY INSTRUMENTS (18 U.S.C. § 1956)

126.    The preceding paragraphs are adopted here, in the Third Predicate Act.

127.    Shortly after Plaintiff defaulted in April 2011, CHASE reviewed his HELOC Account No. 0789108248 and discovered they had been collecting an unlawful debt by demanding payment of $1,388.98 without restoring the Credit Limit. Rather than disclose the error, CHASE concealed it.

128.    Since CHASE was unable to officially collect the unlawful debt, it proceeded to unofficially collect the unlawful debt by:

(a)    Creating a Dummy Loan Account to disguise the fact that it was actively seeking to collect an unlawful debt pursuant to HELOC Account No. 0789108248.

(b)    CHASE created Dummy Loan Account ("DLA"): **DLA-000000010726568**.

(c)    Creation of the dummy account constitutes a violation of federal law related to *Bank Entries, Reports, and Transactions* (18 U.S.C. § 1005). Any proceeds derived from monetary transactions in connection with DLA-000000010726568 constitutes the laundering of monetary instruments in violation of 18 U.S.C. § 1956.

(d)    In addition, Riley's forged Endorsement of a photocopy of Plaintiff's Credit Agreement and Driver's False *Affidavit of Lost Security* BOTH constitute violations of federal law relate to the *Securities of States and Private Entities* (18 U.S.C. § 513).

(e)    Therefore, transactions referencing DLA-000000010726568 as well as Riley's forged Endorsement, and Driver's false *Affidavit of Lost Security* are all property that represents the "proceeds of some form of unlawful activity."

<u>FOURTH PREDICATE ACT: DEALING IN PROPERTY DERIVED FROM SUA (18 U.S.C. §1957)</u>

129.    The preceding paragraphs are adopted here, in the Fourth Predicate Act.

130.    The term, "security" as defined in 18 U.S.C. § 513 includes: a "*note*, stock certificate, treasury stock certificate …. or *certificate of interest in* tangible or *intangible property*." 18 U.S.C. § 1957(c)(3)(A).

131.    The property derived from SUA includes of a:

(a)    forged negotiable instrument bearing a Riley Endorsement stamp and a

(b)    false Affidavit of Lost Security, sworn to by Driver on March 16, 2015.

132.    On or about July 25, 2016, Defendants participated in a monetary transaction

involving Driver's Affidavit of Lost Security.

(a)    Specifically, YORAM paid $45,000.00 in exchange for Driver's False Affidavit of Lost Security in violation of 18 U.S.C. § 1957.

(b)    RRA received the funds in their attorney escrow account. The ROSICKIS are authorized signers on the account and passed the proceeds onto CHASE.

133.    Moreover, the wiring instructions refer to the DLA-000000010726568 and any money transfer in connection with the DLA constitutes laundering of a monetary instrument in violation of 18 U.S.C. §§ 1956, 1957.

FIFTH AND SIXTH PREDICATE ACTS: MAIL AND WIRE FRAUD (18 U.S.C. §§ 1341, 1343)

134.    The preceding paragraphs are adopted here, in Fifth and Sixth Predicate Acts.

135.    Defendants also violated mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.

(a)    The mail and wire fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services" through bribes and kickbacks in violation of U.S.C. § 1946.

(b)    The mail fraud statute reads in relevant part as follows:

> "Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses representations or promises ... [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both]" 18 U.S.C. § 1341.

(c)    The wire fraud statute is in relevant part identical. *See* 18 U.S.C. § 1343.

(d)    In *McNally v. United States,* 483 U.S. 350 (1987), the Supreme Court interpreted the statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id.* at 352.

(e)    In response to *McNally,* Congress broadened the scope of the mail and wire

fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services." 18 U.S.C. § 1346.

**(f)**    Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

**(g)**    In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S. Ct. at 2928, 2931. The Court held that the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services provision"), applies to bribes and kickbacks and concluded that, "*there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks*" because the "*vast majority*" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.*2930-31.

**136.**    Thus, as an alternate, or in addition to the Fourth Predicate Act alleging violations of 18 U.S.C. § 1957 for engaging in a monetary transaction in property derived from specified unlawful on July 25, 2016, Plaintiff alleges that the same transaction constitutes a scheme to extract bribes and kickbacks between CHASE and YORAM in violation of the mail and wire fraud statutes that deprived the Plaintiff of the intangible right to "honest services" from CHASE as a borrower and from YORAM as a Co-op shareholder.

137.    Other evidence of violations of the mail and wire fraud statutes include:

(a)    Written correspondence from CHASE dated August 2, 2011 and October 3, 2011 referencing DLA 000000010726568 and

(b)    Written correspondence from RRA dated February 14, 2012 and August 28, 2012 referencing the same DLA 000000010726568.

(c)    Liability passes to DIMON and the ROSICKIS, the principal executives.


138.    YORAM and PLLC also contributed at least two predicate acts of mail and/or wire fraud. Specifically, a PLLC attorney sent Plaintiff, John and Jane Doe residents of the Unit a *Ten-Day Notice to Vacate* dated July 22, 2016 on YORAM's behalf as the "Landlord." The notice threatened the residents with an eviction proceeding. Said notice was served by mail and in person on Plaintiff and the Doe residents. The claims have since been rejected by the Housing Court.

(a)    The following month, Plaintiff former fiancé suddenly moved out and cancelled their wedding. For some reason, she was spooked by the surprise notice and the prospect of marrying a homeless person to live on the street did not appeal to her.

(b)    Four years later, Plaintiff is neither homeless nor living on the street. He is, however, still unmarried.

(c)    This is the second time the Defendants' frustrated the Plaintiff's plans to marry. The first occurred in 2011 when every aspect of his life was destroyed: business, personal, financial, social, professional, physical, emotional, and spiritual.

<u>ECONOMIC INJURY TO PLAINTIFF</u>

139.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Defendants, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in the following four ways:

(a)    *Plaintiff's Loss of Personal Income*. As previously mentioned, Plaintiff had a thriving construction business in 2009. In addition to the $1.2M in annual revenues during the 2009 calendar year, Plaintiff's personal income from his small business was $111,000.00 in 2009. To be sure, a federal tax lien for the 2009 tax year was prepared on December 23, 2016 and filed on January 6, 2017 in the Office of the City Register, Kings County, **CRFN 2017000008841**.

The amount of unpaid income taxes for 2009 is **$31,076.78** and the income tax rate in 2009 was 28%. If Plaintiff owes $31,076.78 in unpaid income taxes from 2009, then the Plaintiff's taxable income in 2009 was approximately $111,000 ($31,076.78 divided by 0.28 is $110,988.50). Thus, **Plaintiff's 2009 personal income was $111,000**. Notably, the Plaintiff's unpaid income tax for the 2010 calendar year is $1,407.26. At a 15% tax rate in 2010, the amount of unpaid income taxes corresponds to a taxable income in 2010 of approximately **$9,400** ($1,407.26 divided by 0.15 is $9,381.73). Plaintiff's personal income in 2011 to 2020 was **ZERO**.

(b)    *Plaintiff's Loss of Business*. The reason Plaintiff has not had any personal income since 2011 is because he suffered a total loss to his business on October 2011 when A-1 was evicted and forfeited its assets. Between 2012 and 2016, Plaintiff used his retirement savings to make ends meet as a result of the loss to his business and

personal income. Plaintiff depleted his retirement savings in 2016. Today, Plaintiff does not have a checking or savings account. He has one credit card with a $300 limit. His credit score is below 500. He was receiving public assistance between 2017 and 2019. In fact, the Human Resources Administration filed a UCC-1 Finance Statement against the subject Unit. To date, Plaintiff received approximately $7,000 in public assistance from the City and State of New York.

A-1 had $1.2M in annual revenue during the 2009 calendar year. **Plaintiff suffered a complete loss of business revenue in the amount of $1.2M annually since 2011 and for the ten-year period that followed**.

(c)   *Plaintiff's Loss of Property*. Plaintiff also suffered losses to his property when the commercial garage was repossessed in October 2011. **Plaintiff suffered losses to his personal and business property in the amount of $350,000**.

(d)   *Plaintiff's Loss of Title to Unit 3J*. Plaintiff was also injured by the loss of his Title to the subject Unit, which has a fair market value of about $250,000. Thus, **Plaintiff suffered a loss of Title valued at $250,000**.


PLAINTIFF IS ENTITLED TO AN AWARD OF TREBLE DAMAGES

140.   Pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d), Plaintiff is entitled to recover from the Defendants treble damages plus costs and attorney fees, if any.

(a)   Plaintiff's personal income in 2009 was $111,000, $9400 in 2010, and zero every year thereafter. Accordingly, Plaintiff suffered losses to his personal income in the aggregate amount of $111,000 annually for ten years between 2011 and 2020 and

$101,600 in 2010 for a **cumulative loss of $1,211,600 in personal income**.

(b)    A-1's business revenue in 2009 was $1.2M but suffered a total loss in 2011 and has had zero revenue ever since. Accordingly, Plaintiff suffered losses to his business in the aggregate amount of $1.2M for ten years between 2011 and 2020 for a **cumulative loss of business revenue in the aggregate amount of $12,000,000**.

(c)    In addition, Plaintiff suffered a loss to his personal and business property when its commercial garage was repossessed in October 2011. A-1 lost two commercial trucks, material, tools, and other equipment worth approximately $350,000. Thus, Plaintiff suffered a **cumulative loss of personal and business property in the aggregate amount of $350,000**.

(d)    Lastly, Plaintiff lost the Title to the subject Unit which has a fair market value of $250,000.

141.    Plaintiff is entitled to treble the damages claims as follows:

(a)    **$1,211,600 in lost personal income trebled to $3,634,800**.

(b)    **$12,000,000 in lost business revenue trebled is $36,000,000**.

(c)    **$350,000 in lost personal and business property trebled is $1,050,000**

(d)    **$250,000 in lost fair market value trebled is $750,000**.


WHEREFORE, Plaintiff demands judgment be entered in Count I against all Defendants and in favor of the Plaintiff in the amount of **$41,434,800.00** with pre and post judgment interest as authorized by law plus **$400.00** for the cost of this suit along with reasonable attorney fees, expert fees, and expenses, if any.

## COUNT TWO

CONSPIRACY TO VIOLATE THE RICO STATUTE 18 U.S.C. § 1962(d)
Against All Defendants

142.    The preceding paragraphs are adopted here, in Count II.

143.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

144.    Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

145.    As set forth in Count I, above, at all relevant times, Plaintiff was and is a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

146.    As also set forth in Count II, above, at all relevant times, the Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

147.    The Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of collecting an unlawful debt, extortion, conversion of property.

148.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

149.    As set forth in Count I, above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

150.    The Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate,

directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

151.    The Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count One

152.    As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C.§ 1962(c), Plaintiff has been and continues to be injured in his business and property in the amount set forth above in Count I under *Economic Injury to Plaintiff*.

153.    Plaintiff is therefore entitled to treble the damages claimed as follows:

(a)    **$1,211,600 in lost personal income trebled to $3,634,800**.

(b)    **$12,000,000 in lost business revenue trebled is $36,000,000**.

(c)    **$350,000 in lost personal and business property trebled is $1,050,000**

(d)    **$250,000 in lost fair market value trebled is $750,000**.

WHEREFORE, Plaintiff demands judgment be entered in Count II against all Defendants and in favor of the Plaintiff in the amount of **$41,434,800.00** with pre and post judgment interest as authorized by law plus **$400.00** for the cost of this suit along with reasonable attorney fees, expert fees, and expenses, if any.

## COUNT THREE

DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201, 2202
Against JPMorgan Chase Bank, N.A., Yoram Nachimovsky, Esq.,
and 2939 Avenue Y Tenants Corporation

**154.**     The preceding paragraphs are adopted here, in Count III.

**155.**     There is an actual case and controversy between the Plaintiff and CHASE regarding the validity, enforceability and indebtedness of a certain Loan the value of which exceeds $75,000.00 and is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201. Specifically, the Plaintiff avers as follows:

**(a)**     The October 19, 2007 Credit Agreement with WaMu is a valid contract.

**(b)**     On September 25, 2008, CHASE won a bid to purchase WaMu's assets from the FDIC, including the right to service Plaintiff's Credit Agreement.

**(c)**     However, CHASE never intended on extending any credit to the Plaintiff and in fact failed to perform its obligations under the terms of the Credit Agreement.

**(d)**     Meanwhile, the Plaintiff was forced to perform his obligations under the Credit Agreement. In fact, Plaintiff was forced to perform above and beyond the original terms of his Credit Agreement because the original terms only required the Plaintiff to pay a monthly minimum interest on the outstanding balance at a variable rate of 0.51% below prime. CHASE, however, continued to charge 7.84% interest when the stated rate was 2.23%. CHASE also demanded principal payments at the same time it refused to perform under the contract and make available for later use the Plaintiff his extra principal payments.

**(e)**     CHASE was unjustly enriched by its deliberate nonperformance.

**(f)**     Plaintiff was injured as a result of CHASE's willful breach.

49

**(g)**    CHASE's willful nonperformance rendered the terms of the Credit Agreement legally usurious and unconscionable.

**(h)**    CHASE's conduct is irreprehensible because it knew all along that its actions were unlawful. CHASE deliberately circumvented the courts and evaded judicial review to further achieve it4s unlawful goals.

**(i)**    CHASE still sought enforcement of an unlawful debt by extortionate means when it proceeded with non-judicial enforcement under Article 9 of the UCC.

**(j)**    Under such circumstances, it seems appropriate to discharge the FRLO.

**(k)**    But Plaintiff is not trying to avoid payment. He intends to pay all his debts.

**156.**    Indeed, he is simply asking the Court to invoke its equity power to grant equitable relief.

WHEREFORE, Plaintiff prays for a judgment in Count III declaring that:

- the Plaintiff's *secured* WaMu HELOC Credit Account No. 0789108248 is fully satisfied and closed with a zero balance,

- the Plaintiff's WaMu FRLO Account No. 0789108230 was voluntarily transferred by CHASE to an *unsecured* Loan Account No. 429400108248,

- the Plaintiff is not in default of CHASE's *unsecured* Loan No. 429400108248,

- the Plaintiff's *unsecured* Loan No. 429400108248 is an interest-free loan,

- the September 20, 2012 UCC Article 9 sale of the Plaintiff's 582 shares of Y-CORP Stock and Proprietary Lease to Unit 3J located at 2939 Avenue Y in Brooklyn, NY void, *ab initio*,

- All subsequent transfers, sales, and assignments void, *ab initio*, and

- the Plaintiff the lawful owner and holder of Title to 2939 Avenue Y, Apt. 3J, Brooklyn, NY 11235, to wit: 582 shares of Y-CORP Stock and Proprietary Lease appurtenant to Unit 3J.

## COUNT FOUR

PERMANENT INJUNCTION

Against JPMorgan Chase Bank, N.A. and JAMIE L. DIMON

157.    The preceding paragraphs are adopted here, in Count IV.

158.    Time and time again, with billion-dollar settlement after billion-dollar settlement, Defendant JPMORGAN CHASE BANK, N.A. has shown that no amount of monetary fine, money judgment, or financial settlement can bring a change in behavior and put an end to the fraudulent and illegal foreclosure practices at CHASE.

159.    Absent a change in leadership, which is a remedy Congress intended to provide when it enacted the RICO Statute, a permanent injunction is the only remedy to bring meaningful change and put an end to CHASE's unlawful practice of pursuing UCC Article 9 remedies to enforce loans originated by Washington Mutual Bank and secured by New York Cooperative interests.

160.    Plaintiff has demonstrated a likelihood of success on the merits. Plaintiff has also demonstrated irreparable injury from the total loss of business to the loss of personal relationships, social, and emotional wellbeing and support, and to the oppressive, cruel, and unusual, nature of this never-ending nightmare that has consumed half of the Plaintiff's adult life. But it did not have to happen.

161.    Nor should it happen to anyone else, either. The injunctive relief Plaintiff seeks is in the public interest and will prevent others from suffering a similar fate.

WHEREFORE, Plaintiff prays for a permanent injunction in Count IV to enjoin Defendant JPMORGAN CHASE BANK, N.A. from conducting any future UCC Article 9 sales of NY Co-op interests securing loans by Washington Mutual Bank.

## COUNT FIVE to COUNT FIFTEEN

162.    In the interest of brevity and to avoid the extra burden of an even larger Complaint with multiple state law claims, the Plaintiff elects to give notice of his intention to add the following causes of action through counsel at a later stage in the proceedings. A non-exclusive list of additional causes of action reserved by the Plaintiff for inclusion at a later stage upon amendment includes:

(a)    Breach of Contract (Against CHASE),

(b)    Breach of Implied Covenant of Good Faith (Against CHASE),

(c)    Conversion (Against CHASE and YORAM),

(d)    Common Law Fraud, (Against ALL Defendants),

(e)    Unjust Enrichment (Against ALL Defendants),

(f)    Intentional Infliction of Emotional Distress (Against ALL Defendants),

(g)    Slander of Title (Against ALL Defendants),

(h)    Negligent Infliction of Emotional Distress (Against ALL Defendants),

(i)    Abuse of Process (Against ALL Defendants), and

(j)    Violation of NY Judiciary Law § 487 (Against YORAM and PLLC)

### DISCLAIMER

163.    Plaintiff asserts no claims against the FDIC, either in its corporate capacity or as receiver for Washington Mutual Bank. Plaintiff asserts no claims for which Washington Mutual Bank, if it had not been put into receivership, could have been liable. The FDIC Receivership's claims administration process as set forth in the Financial Institutions Reform, Recover, and Enforcement Act, 12 U.S.C. § 1821(d)(3)-(10) and (13), does not apply here as this action seeks damages after January 1, 2009.

WHEREFORE, Plaintiff demands judgment:

1. On Counts One and Two awarding Plaintiff treble damages for Defendants' violation of RICO in the amount of **$41,463,000.00** with pre and post judgment interest as authorized by law plus **$400** for the cost of this suit along with reasonable attorney fees, expert fees, and expenses, if any;

2. On Count Three against the Defendants named therein pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2201, declaring that:

   (i) the Plaintiff's *secured* WaMu HELOC Credit Account No. 0789108248 fully satisfied and closed with a zero balance,

   (ii) the Plaintiff's WaMu FRLO Account No. 0789108230 was voluntarily transferred by CHASE to an *unsecured* Loan Account No. 429400108248,

   (iii) the Plaintiff not in default of CHASE's *unsecured* Loan No. 429400108248,

   (iv) *Unsecured* Loan No. 429400108248 is an interest-free loan with a starting balance of $162,547.43 on July 24, 2009 with twenty monthly payments of $1,388.98 made through March 2011 and remaining balance of $134,767.83,

   (v) the September 20, 2012 UCC Article 9 sale of the Plaintiff's 582 shares of Y-CORP Stock and Proprietary Lease to Unit 3J located at 2939 Avenue Y in Brooklyn, NY is void, *ab initio*,

   (vi) All subsequent transfers, sales, and assignments are void, *ab initio*, and

   (vii) the Plaintiff the lawful owner and holder of Title to 2939 Avenue Y, Apt. 3J, Brooklyn, NY 11235, *to wit*: 582 shares of Y-CORP Stock and Proprietary Lease appurtenant to Unit 3J.

3. On Count Four a permanent injunction restraining JPMORGAN CHASE BANK, N.A. from conducting any future UCC Article 9 sales of New York Cooperative interests securing loans originated by Washington Mutual Bank; and

4. Any other relief the Court deems just and proper.

Dated:  November 3, 2020
   Brooklyn, New York

      Yours, etc.

           Ahmed Elnenaey
           Plaintiff, *pro se*
           2939 Avenue Y, Apt. 3J
           Brooklyn, NY 11235
           ahmed.elnenaey@gmail.com

## VERIFICATION

State of New York  )
County of Kings   ) ss:

  I, **AHMED ELNENAEY**, declare under penalty of perjury that the foregoing

statements are true and correct, except on matters therein stated on information and

belief, and on those matters, I believe them to be true.

Dated:  November 3, 2020
   Brooklyn, New York

           Ahmed Elnenaey
           Plaintiff, *pro se*
           2939 Avenue Y, Apt. 3J
           Brooklyn, NY 11235
           ahmed.elnenaey@gmail.com

# **Contents of Appendix**

| | |
|---|---|
| 1* | Post-Trial Decision/Order (J. Ofshtein) dated January 15, 2019 |
| 2 | Yoram Nachimovsky's Holdover Petition in NYC Civil Court dated September 2, 2016<br>Index No. 084765/2016, *Yoram Nachimovsky v. Ahmed Elnenaey, John, and Jane Doe* |
| 3 | Affidavit of Yoram Nachimovsky dated April 9, 2017 |
| 4 | **Plaintiff's Loan Documents**:<br>WaMu Equity Plus Agreement, Loan Security Agreement, Stock Power, Assignment of Lease |
| 5 | Payment and Transaction History for **HELOC No. 0789108248 and FRLO No. 0789108230** |
| 6 | Transaction History for **Chase Unsecured Loan Account No. 429400108248** |
| 7 | Closing Records for Plaintiff's Bank-Owned Co-op Purchases in 2002 and 2005 |
| 8 | 2007 Appraisal of Subject Unit After Renovations Estimate at $210,000 |
| 9 | Plaintiff's Business Corporation Filing Documents and Bank Statements, and Eviction Notice |
| 10 | Correspondence from Chase Bank referencing Loan No. 000000010726568 |
| 11 | Correspondence from RRA referencing Loan No. 000000010726568 |
| 12 | Plaintiff Reply letter to RRA dated September 20, 2012 |
| 13 | *Affidavit of Lost Proprietary Lease and Stock Certificate,* Jonathan B. Driver, March 16, 2015 |
| 14 | RRA's Acknowledgement Receipt of Collateral Loan Records from Chase |
| 15 | Purchase Offer by Yoram Nachimovsky to Tom Marco Real Estate, Inc. dated July 2, 2015 |
| 16 | Confirmation of Wire Transfer with Wire Instructions referencing Loan No. 000000010726568 |
| 17 | Copies of Documents Filed with the Office of City Register (Kings county) |
| 18 | Copies of Subpoenas in Civil and State Court cases |
| 19 | Pertinent pages from the Deposition of Cynthia A. Riley with Voluntary Withdrawal by Chase |
| 20* | Supreme Court Orders dated January 10, 2018, February 26, 2018, Orders on Appeal in Docket Nos. 2020-03220, 2020-03224, with proposed Decision/Order under review on Appeal. |

*\*Additional background on Holdover at #1; background on Supreme Court action at # 20.*